# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Autumn Lee Tangas,                                        Case No. 3:15CV1566

       Plaintiff

       v.                                        **ORDER**

International House of Pancakes, LLC, et al.,

       Defendants

      This is an indemnification case.

      Plaintiff Autumn Lee Tangas is a former Franchise Bureau Consultant (FBC) for defendant International House of Pancakes, LLC (IHOP).

      In September, 2011, the Federal Bureau of Investigation raided five IHOP restaurants run by a franchisee, Tarek Elkafrawi, whose operations Tangas oversaw. As IHOP began investigating the Elkafrawi affair, Tangas cooperated with her employer. But when it became clear that she, too, was a target of the criminal probe, she declined, on her lawyer's advice, IHOP's request to participate in an internal interview. Concluding that her refusal to cooperate with the investigation violated IHOP's code of conduct, IHOP fired Tangas.

      Three months later, a federal grand injury indicted Elkafrawi, Tangas, and sixteen others on charges of money laundering, conspiracy to harbor aliens, and mail fraud. The indictment alleged that Elkafrawi was engaged in a wide-ranging scheme to underreport sales figures, defraud the Ohio

Bureau of Workers Compensation, and employ illegal aliens. As to Tangas, the indictment alleged that she used her position as Elkafrawi's FBC to shield his wrongdoing from corporate scrutiny.

In May, 2014, after Tangas incurred more than $130,000 in legal fees, federal prosecutors dismissed the charges against her without prejudice.

Tangas asked IHOP to indemnify her, but the company, citing the allegations in the criminal case, refused. Tangas then filed this suit against IHOP and its parent company, DineEquity, Inc. Tangas alleges that IHOP's LLC agreement and DineEquity's corporate bylaws obligate the defendants to indemnify her for the attorney's fees she incurred in the criminal case.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1). (Doc. 18 at ¶¶2–4).

Pending are the parties' counter-motions for summary judgment. (Docs. 37, 46). For the following reasons, I grant the defendants' motion and deny Tangas's motion.

## Background

Before 2007, the IHOP Corporation franchised individual IHOP restaurants. (Doc. 37–2 at 1, ¶2). In 2007, "the IHOP Corporation bought Applebee's. As part of that transaction, DineEquity Inc. was formed as the parent company owning both IHOP and Applebee's Restaurants LLC." (*Id.*). DineEquity and IHOP are separate entities, but DineEquity provides "human resources and legal support" to its subsidiary. (*Id.* at 2, ¶3)

Tangas began working for IHOP in 1991; in 2003, she became an FBC.

In that position, Tangas acted as a liaison between IHOP corporate and the franchisees who operated restaurants in her territory, which included parts of Ohio, Michigan, Kentucky, and Pennsylvania. Tangas helped franchisees boost sales and ensured that they adhered to IHOP operating standards.

### A. Tangas and Elkafrawi

Among the franchisees whom Tangas oversaw was Tarek Elkafrawi, also known as "Terry Elk." Elkafrawi operated four IHOP restaurants in the Toledo, Ohio, area, one each in Findlay, Ohio, and Lima, Ohio, as well as restaurants in other states. (Doc. 46–1 at 3; Doc. 46–2 at ¶8).

Tangas met Elkafrawi sometime in the late 1990s or early 2000s, but her interactions with him were minimal. (Doc. 46–2 at ¶8). After their working relationship intensified, Tangas concluded that Elkafrawi had a "poor business structure and weak management skills." (*Id.* at ¶9). She also believed that his restaurants had problems with "cleanliness, customer complaints, poor sales, and high management turnover." (*Id.* at ¶11).

Tangas eventually became so concerned with Elkafrawi's performance that she "questioned whether he was under-reporting sales." (*Id.* at ¶12). She discussed her concerns with her supervisor, Mark Brower, but he and IHOP corporate ignored them. (*Id.* at ¶¶11–12, 15). Tangas nevertheless maintained a good relationship with Elkafrawi, but she denied they were "friends." (*Id.* at ¶16).

However, Tangas's domestic partner, Lisa Ross, was friends with Elkafrawi. (*Id.* at ¶17; Doc. 46–3 at ¶5). Ross had met Elkafrawi in 1998, before she knew Tangas. (Doc. 46–3 at ¶4). After Tangas and Ross moved to Toledo in 2003, Ross spent a good deal of time with Elkafrawi, who lived in Evansville, Indiana, but often came to Toledo for business. (*Id.* at ¶5).

In 2004, and without informing Tangas, Ross loaned Elkafrawi $50,000 from her and Tangas's joint bank account. (Doc. 46–3 at ¶¶7–8).

There is conflicting evidence as to the true purpose of this transaction.

Ross claimed that it was purely a loan to help a friend in financial distress. (*Id.* at ¶¶7–8). Tangas maintained that Elkafrawi had "pulled a fast one" on Ross by telling her "she could make

a good profit by investing in" his IHOP restaurant in Holland, Ohio. (Doc. 37–2 at 70). Elkafrawi told the FBI that Tangas decided to invest in his restaurant, and that "Ross' name was used as a cover." (*Id.* at 43). Donna Harriott, a manager of two of Elkafrawi's restaurants, alleged that Tangas told her she "had invested approximately $50,000 in Elkafrawi's Airport Highway restaurant," and that, in return, "Ross was put on the [restaurant's] health insurance plan." (Doc. 37–6 at 1).

According to Ross, when she told Tangas about the loan, Tangas became "extremely upset" because she "felt that the loan" created a "conflict of interest in her role as Terry's FBC." (Doc. 46–3 at ¶9; *see also* Doc. 46–2 at ¶17). Under IHOP's Code of Conduct, a conflict of interest arises when an IHOP employee has "a personal interest in a . . . franchisee of the company." (Doc. 37–2 at 19). The Code requires that any conflict be "disclose[d] . . . to [a] supervisor." (*Id.*).

At Tangas's urging, Ross asked Elkafrawi to return the money. When, several months later, he did so, he included $8,000 in interest (though Ross returned that money). (Doc. 46–3 at ¶9).

It is undisputed that Tangas did not disclose these events to IHOP or her supervisor. (Doc. 46–2 at ¶18). According to Tangas, she did not believe "that it was a violation of any company policy" because she "never considered it to be an 'investment' in Elk's restaurants." (*Id.*). But Tangas acknowledged that the transaction "ran contrary to her role as FBC and could be perceived to be unethical." (Doc. 18 at ¶25).

### B. Federal Investigation

In September, 2011, the Federal Bureau of Investigation raided Elkafrawi's home and IHOP franchises. (Doc. 37–2 at ¶5). The raid was part of the FBI's inquiry into apparently widespread criminal activity at his restaurants, including employing and harboring illegal aliens, money laundering, and fraud.

When Tangas learned of the raid, she asked a representative from either DineEquity's or IHOP's legal team what to do if the FBI wanted to speak with her; the representative told her "to cooperate and talk to the FBI." (Doc. 46–2 at ¶19).

On September 26, FBI agents questioned Tangas at her home about "Elk's employees and hiring practices." (*Id.* at ¶20). Tangas explained that she had "no involvement with or access to Elk's hiring practices or 'back office' operations." (*Id.*). She also told them Elkafrawi had financial problems. (*Id.*). It was in this context that Tangas revealed Ross's loan to Elkafrawi and her own failure to report it to IHOP. (*Id.*).

At the close of the interview, which, according to Tangas, had grown "more and more accusatory," Tangas had the impression that the agents "believed [she] had done something wrong or was not telling them what they wanted to hear." (*Id.* at ¶21).

### C. IHOP's Internal Investigation

IHOP opened its own investigation after the raid. (Doc. 37–2 at 2–3, ¶8). Christine Son, DineEquity's in-house counsel, testified that "IHOP did not know if the company itself might be a target of the FBI's investigation or a victim of potential wrongdoing." (*Id.*).

Son spoke with Tangas by phone on September 26, shortly after Tangas had spoken to the FBI. (*Id.* ¶9). She told Tangas that she represented only IHOP. (*Id.*).

According to Tangas, Son asked her to relate everything she had discussed with the FBI. Tangas told her that the agents had asked her not to discuss her interview with anyone, but Son instructed her that, as an IHOP employee, Tangas had "no choice" but to disclose everything. Fearing for her job, Tangas did so. (Doc. 46–2 at ¶22).

In October, 2011, Tangas hired a criminal defense attorney, Ralph Meczyk, to represent her. (*Id.* at ¶23; Doc. 37–3 at 122).

In February, 2012, Son asked Tangas to participate in an interview at IHOP headquarters in California. (Doc. 37–2 at 3, ¶10). It was Tangas's understanding that FBI agents would be present (Doc. 37–3 at 153), but Tangas later learned this was not the case. (Doc. 46–2 at ¶24). As Son explained, the FBI "had no role whatsoever in this interview request," which "related solely to IHOP's own internal investigation of the Elkafrawi operations." (Doc. 37–2 at 2, ¶10).

Tangas told Son that she wanted her attorney present, and Son indicated this was acceptable. (Doc. 37–2 at 3, ¶11). But when Son contacted Meczyk to schedule the interview, he declared in an email that Tangas would refuse to answer further questions:

> We have been informed by the United States Attorneys [*sic*] Office that Ms. Tangas is the subject of a Federal Criminal Investigation. As such, she will be invoking her 5th Amendment Rights in response to any questions posed to her in any collateral matters.

(Doc. 37–2 at 7).

Son responded that Tangas was obligated "to cooperate with the Company in investigating any alleged violations" of IHOP's Global Code of Conduct. (*Id.* at 8). According to the Code of Conduct, which Son attached to her email to Meczyk, IHOP employees "are expected to cooperate in the investigation of any alleged violation if requested to do so." (*Id.* at 30). Son advised Meczyk that, if Tangas "refuses to comply in assisting the Company investigate the matter at hand, we will be forced to terminate her employment." (*Id.* at 8).

In a February 29 email response, Meczyk wrote that he "view[ed] this as a retaliatory discharge to Ms. Tangas invoking her 5th amendment right not to testify in this matter. She will not

be answering any questions." (*Id.* at 32). IHOP fired Tangas on March 2 for violating the Code of Conduct and refusing to participate in the interview. (Doc. 37–2 at 4, ¶16).

### D. The Indictment

In May, 2012, a federal grand jury indicted Elkafrawi, Tangas, and sixteen others on charges arising from Elkafrawi's operation of his IHOP franchises. (Doc. 16–1).

The sixty-four-count indictment charged Tangas with one count of money laundering, one count of conspiring to harbor illegal aliens, and four counts of mail fraud. (*Id.* at 6, 26–30). As to Tangas, the indictment essentially alleged that she had used her position as an FBC to shield Elkafrawi's criminal activities from IHOP corporate. (*Id.* at 10–11, ¶33). To support this charge of collusion, the indictment homed in on the $50,000 payment to Elkafrawi.

According to the indictment, this payment helped Elkafrawi purchase an additional IHOP restaurant to extend the reach of his fraudulent operations. (*Id.* at 11, ¶¶34–35). In exchange for the money, Elkafrawi agreed that Ross "would receive health benefits and paychecks[.]" (*Id.* at ¶34). Thereafter, Tangas deposited a $5,000 check drawn on one of Elkafrawi's IHOP's accounts "as a partial return on her sub rosa investment in the Findlay IHOP." (*Id.* at ¶37). The indictment further charged that Tangas "failed to inform IHOP Corporate of her financial relationship with either [Ross] or Elkafrawi." (*Id.* at ¶39).

The upshot of Tangas's activities, the indictment concluded, was that Elkafrawi was effectively "shielded from IHOP corporate scrutiny." (*Id.* at ¶45).

The criminal case against Tangas proceeded for more than two years until, on May 28, 2014, the U.S. Attorney's Office dismissed the charges without prejudice. (Doc. 18 at ¶34). Tangas incurred more than $130,000 in legal fees. (Doc. 18 at ¶48).

## E. Indemnification

DineEquity's corporate bylaws and IHOP's LLC agreement authorize each entity to indemnify its directors, officers, employees, and agents.

Under DineEquity's bylaws, the corporation:

> shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorneys' fees) judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

(Doc. 37–2 at 94).

IHOP's LLC agreement provides that:

> the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil criminal administrative or investigative ("Claims"), in which the Covered Person may be involved, or threatened to be involved as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall not be entitled to indemnification under this Section 8.2 with respect to (i) any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence[.]

(*Id.* at 101).

Sometime before Tangas filed this lawsuit, in August, 2015, she demanded that IHOP pay the legal fees she had incurred defending the criminal action. (Doc. 45–1 at 51–52). IHOP denied the request in light of "the allegations in the indictment and supported by the evidence in the

government interviews." (Doc. 45–1 at 65). Before IHOP made that decision, "the FBI provided part of its investigatory file to IHOP." (Doc. 37–2 at 4. ¶17).

## F. Litigation

Tangas filed this suit in the Lucas County, Ohio, Common Pleas Court. (Doc. 1–1). Her complaint raised claims for: 1) wrongful termination in violation of Ohio's public policy favoring the right to consult with counsel; and 2) indemnification, under Ohio law, for the attorney's fees she incurred in the criminal case. (Doc. 1–1).

After removing the case to this court on the basis of diversity jurisdiction (Doc. 1 at ¶¶9–13), defendants moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).

I denied the motion as to the wrongful-termination claim, finding that Tangas had plausibly alleged that IHOP fired her "for refusing to speak with the FBI and retaining her own counsel." *Tangas v. Int'l House of Pancakes LLC*, 2016 WL 614006, *3 (N.D. Ohio). But I granted the motion, without prejudice, as to the indemnification claim, given that Delaware law, rather than Ohio law, appeared to supply the applicable rule of decision. *Id.* at *4.

Tangas filed an amended complaint in April, 2016, which pleaded the indemnification claim as arising under Delaware law. (Doc. 18). Following a period of discovery, and the filing of the parties' counter-motions for summary judgment, the case is now ripe for decision.[1]

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex*

---

[1] Tangas's cross-motion does not oppose defendants' request for summary judgment on the wrongful-termination claim. (Doc. 46–1 at 2). Accordingly, defendants are entitled to summary judgment on that claim.

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

"Where, as here, parties have filed cross-motions for summary judgment, the Court grants or denies each motion for summary judgment on its own merit, applying the standards described in Fed. R. Civ. P. 56." *Williams v. Ohio Dep't of Rehab. & Corrs.*, 2018 WL 500167, *1 (S.D. Ohio).

### Discussion

The parties' counter-motions raise identical issues: 1) whether Tangas has a right to indemnification under the DineEquity bylaws; and 2) whether Tangas has a right to indemnification under IHOP's LLC agreement.[2]

### A. Indemnification under DineEquity's Bylaws

DineEquity must indemnify a person who is or may be a party to any suit "by reason of the fact that [s]he is or was a director or officer of the Corporation, or is or was serving at the request

---

[2] Defendants also argue that Tangas's motion is untimely under the Local Rules, but I decline to deny the motion on this ground. In entering the scheduling order in this case, I neglected to follow my usual practice of setting, concurrently with the deadline for plaintiff to oppose the defense motion, a deadline for her to file a counter motion. Given that oversight, untimeliness is no basis for denying plaintiff's motion.

of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise[.]" (Doc. 37–2 at 94).

To qualify for indemnification, Tangas must show that she was either "a director or officer" of DineEquity or "serving at the request of [DineEquity] as a[n] . . . employee . . . of another corporation" – i.e., that DineEquity requested her to serve as an FBC for IHOP.

But even viewing the record in the light most favorable to Tangas, there is no evidence that would permit a reasonable jury to find that DineEquity must indemnify Tangas.

### 1. Tangas Was Not an Officer or Director, Nor Did She Serve at the Request of DineEquity

First, it is undisputed that Tangas was not a DineEquity officer or director.

Second, as a matter of Delaware law, an employee of a subsidiary company serves "at the request of" its parent company only when the parent company appoints the employee to a specific position. *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 85 (Del. 1998) ("where a 100% stockholder elects a director to the board of a subsidiary, that director thereafter serves the subsidiary 'at the request' of the stockholder" and is entitled to indemnification by the stockholder); *Zaman v. Amedeo Holdings, Inc.*, 2008 WL 2168397, *19 (Del. Ch.) (where Jeffri, who was the sole owner of parent and subsidiary entities, asked the Derbyshires, who were lawyers, "to serve as his agents for all of his entities," the Derbyshires served "at the requests of the subsidiaries above them").

Tangas has offered no evidence that DineEquity – whether in writing, orally, or otherwise – asked or directed her to serve as an FBC for IHOP. Instead, the undisputed evidence establishes that Tangas was, and always had been, an IHOP employee serving as an FBC at IHOP's request.

## 2. Tangas Was an Employee of IHOP, Not DineEquity

Tangas acknowledged in her declaration in support of summary judgment that she was "hired by . . . [IHOP] . . . on July 29, 1991." (Doc. 46–2 at 2, ¶3). Tangas also conceded that, after the corporate restructuring in which DineEquity emerged as IHOP's parent company, she "continued to be an employee of IHOP." (*Id.*; *see also* Doc. 45–1 at 20).

To be sure, Tangas "considered [herself] to be an employee of DineEquity" (Doc. 46–2 at 2, ¶3), but such a belief, without evidence of an employment relationship between DineEquity and Tangas, does not create a genuine factual dispute. *Guba v. Huron Cnty., Ohio*, 695 F. App'x 98, 105 (6th Cir. 2017) (plaintiff's testimony that she believed a county agency failed to remit certain child-support payments made by her ex-husband was insufficient to permit a jury to find that the agency had in fact failed to remit those payments).

Furthermore, the record establishes that IHOP paid Tangas's salary and issued her W–2 forms. (Doc. 37–2 at 2, ¶4). At all relevant times, moreover, Tangas's direct supervisors were "always IHOP, or IHOP Inc., employees." (*Id.*). In contrast, there is no evidence that DineEquity ever controlled or directed her work as an FBC. (*Id.*).

Tangas nevertheless contends that she was a DineEquity employee because: 1) she received "a twenty-year service award with DineEquity's name on it"; 2) DineEquity's legal department, in consultation with its HR department, decided to fire her; and 3) DineEquity's reason for firing her was that she violated its, rather than IHOP's, code of conduct. (Doc. 46–1 at 25).

None of this evidence permits a reasonable finding that Tangas was a DineEquity employee.

First, Tangas's service award, which commemorated her two decades of "dedicated and loyal service," also displayed an IHOP logo. (Doc. 46–2 at 12). On its face, moreover, the award is silent

as to whether IHOP or DineEquity employed Tangas. Only through speculation, then, could a jury find that the service award is evidence that DineEquity was Tangas's employer. *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008) (plaintiff "cannot rely on conjecture or conclusory accusations" to defeat summary judgment).

Second, the record does not support Tangas's assertion that it was DineEquity's legal team that fired her.

It is undisputed that DineEquity is IHOP's parent company, and that it provides "shared services," including "legal support," to its subsidiary. (Doc. 37–2 at 2, ¶3). But Son testified without contradiction that she acted in her capacity as IHOP's counsel when she investigated the Elkafrawi matter and fired Tangas. (Doc. 37–2 at 3, ¶¶8–9). Indeed, Tangas agreed that, in their discussions, Son "made it clear that [Son] only represented IHOP." (Doc. 46–2 at ¶22).

Third, though denominated "DineEquity, Inc. Global Code of Conduct," the Code of Conduct at issue applied to "[a]ll officers and team members of DineEquity, Inc., [IHOP], Applebee's [ ] and all of the affiliates and subsidiaries of those companies." (Doc. 37–2 at 10). It is therefore incorrect to say that DineEquity fired Tangas for violating *only* DineEquity's Code of Conduct, for what violated that Code necessarily violated IHOP's Code of Conduct.

Given the undisputed evidence that DineEquity never requested that Tangas work as an FBC, as well as the evidence establishing that IHOP hired, paid, supervised, and issued W–2 forms to Tangas, there is simply no basis for a jury to conclude that DineEquity must indemnify Tangas.

### 3. Delaware's Mandatory-Indemnification Law Does Not Apply to Tangas

Finally, Tangas contends that a provision of Delaware corporate law requires DineEquity to indemnify her because she was successful in defending the criminal case. (Doc. 46–1 at 24–25).

At one time, Delaware law required corporations to indemnify any director, officer, employee, or agent who was "successful on the merits or otherwise in defense of any action." *Green v. Westcap Corp. of Del.*, 492 A.2d 260, 262 (Del. Super. 1985). Now, however, the mandatory duty to indemnify applies only to officers and directors. *See* 8 Del. C. § 145(c) (if a "present or former officer or director" is successful in litigation, "such person shall be indemnified against expenses (including attorney's fees) actually and reasonably incurred by such person").

Because Tangas was not an officer or director of any company, let alone of DineEquity, the mandatory-indemnification provision does not apply to her.

### B. Indemnification under IHOP's LLC Agreement

Under its operating agreement, IHOP "shall indemnify" a "Covered Person" against "any and all . . . expenses . . . arising from any and all . . . suits or proceedings, civil, criminal, administrative or investigative . . . in which the Covered Person may be involved, or threatened to be involved . . . as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs." (Doc. 37–2 at 101).

"Covered Persons" include "the Member [i.e., DineEquity], any officers, directors, stockholders, partners, employees, affiliates, representatives, or agents of any of the Member," or "any officer, employee, representative, or agent of the Company [i.e., IHOP]." (*Id.*).

The LLC agreement relieves IHOP of its duty to indemnify a "Covered Person" "with respect to . . . any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence[.]" (*Id.*).

## 1. Parties' Arguments

Defendants seek summary judgment on three grounds.

They first argue that the indemnification provision covers only those expenses that current, as opposed to former, IHOP employees incur. (Doc. 37–1 at 22). Defendants concede that Tangas "was a 'Covered Person' when she was an IHOP employee" and became a target of the federal investigation, but contend that "her status as a 'Covered Person' ended upon termination." (*Id.*). This is so, defendants maintain, because the indemnification provision applies only to "Covered Persons" who are "involved, or threatened to be involved," in a proceeding.

Next, defendants argue that Tangas's indemnification rights did not continue after IHOP fired her. Defendants acknowledge that Delaware corporate law sets a default rule that indemnification rights continue after a person ceases to be an employee, *see* 8 Del. C. § 145(j), but they argue, correctly, that no such default exists for LLCs. Because IHOP's LLC agreement does not specify that indemnification rights continue after a firing, defendants maintain it does not cover Tangas's post-termination expenses.

Finally, defendants argue that, even if IHOP were obligated to indemnify Tangas, her fraud and willful misconduct relieved IHOP of that obligation. According to the defense, Tangas engaged in fraud when she failed to report the conflict of interest that arose when Ross loaned $50,000 to Elkafrawi. Defendants also maintain that Tangas committed willful misconduct by refusing to participate in an interview during IHOP's investigation.

Tangas contends that she is entitled to summary judgment because the LLC agreement created a contingent right to indemnification that vested when she became a target of the federal

investigation – "threatened to be involved as a party," in the contractual language – and that this right continued after her firing.

She also disputes IHOP's claim that she engaged in fraud and willful misconduct. Tangas argues that there is no evidence that she engaged in the wrongdoing alleged in the federal indictment. She also contends her refusal to participate in the interview was not willful, given that circumstances – namely, the pending criminal investigation – all but compelled her not to participate.

Finally, Tangas asserts that any alleged misconduct was not "with respect to" the criminal case, and thus provides no basis for denying indemnification.

### 2. The LLC Agreement Does Not Obligate IHOP to Indemnify Tangas for Her Post-Firing Expenses

"In Delaware, limited liability companies are creatures of contract, designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved." *Fillip v. Centerstone Linen Servs., LLC*, 2014 WL 793123, *3 (Del. Ch.).

Insofar as indemnification is concerned, Delaware law leaves it to each LLC to decide whether and to what extent it will indemnify its members, officers, and employees. According to 6 Del. C. § 18–108:

> subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever.

The parties agree that Tangas was a "Covered Person" until March 2, 2012, when she lost her job, and that, setting aside the issue of fraud and bad faith, Tangas would be entitled to indemnification for expenses she incurred until March 2. The critical dispute is whether Tangas is

entitled to indemnification for expenses she incurred after her firing, which represent the vast majority of the damages she seeks.

The LLC agreement extends indemnification rights only to "Covered Persons" – including employees like Tangas – who "may be involved," or are "threatened to be involved," in a criminal proceeding. (Doc. 37–2 at 101).

This language requires the presence of a "Covered Person" in a proceeding, or that a "Covered Person" be "threatened to be involved" in such a proceeding. It contrasts, rather starkly, with the language of DineEquity's bylaws, which extends indemnification rights to any person who is a party to a proceeding "by reason of the fact that he *is or was* a director or officer of the Corporation, or *is or was* serving at the request of the Corporation as a director, officer, employee or agent of another corporation[.]" (Doc. 37–2 at 94) (emphasis supplied). Such language clearly contemplates that a former employee may be entitled to indemnification.

Tangas does not offer a convincing interpretation of the indemnification clause that would cover her post-termination expenses. Rather, she argues that, by failing to specify that the indemnification clause does not exclude former employees, IHOP implicitly agreed to cover the expenses of its former employees. This argument lacks merit because it has no logical endpoint. There are many categories of people whom the LLC agreement does not define as "Covered Persons"; under Tangas's interpretation, all such categories of persons could claim indemnification.

Case law suggests, moreover, that, absent language in a corporate governing document that refers to "current or former" employees, Delaware courts will interpret a term like "employee" as referring to current employees only. *Cf. Charney v. American Apparel, Inc.*, 2015 WL 5313769, *15 (Del. Ch.) ("When the words 'officers' and 'directors' are not qualified by the adjective 'former' (or

a similar adjective), Delaware courts have interpreted those words to current officers and current directors.").

Tangas also contends that her right to indemnification vested when she became a target of the federal probe, and that defendants could not strip her of that right by firing her or otherwise.[3]

But Tangas points to no language in the LLC agreement that obligates IHOP to cover the expenses she incurred when she was no longer a "Covered Person." *See Fillip*, *supra*, 2014 WL 793123 at *3 ("duties or obligations must be found in the LLC Agreement or some other contract"). All the operating agreement obliges IHOP to do is indemnify a "Covered Person" who is involved in, or is threatened to be involved in, a proceeding.

What's more, the operating agreement, taken as a whole, suggests that IHOP never intended to extend indemnification rights to former employees like Tangas, even if that person became entitled to indemnification while still a "Covered Person." Section 8.3 of the operating agreement is titled "Amendments to this Article," and it limits IHOP's ability to strip "Covered Persons" of their existing indemnification rights. The section provides that:

> [a]ny repeal or modification of [the indemnification article] shall not adversely affect any such right of such Covered Person pursuant to this [indemnification article], including the right to indemnification . . . existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

(Doc. 37–2 at 102).

This language forbids IHOP from retroactively stripping a "Covered Person" of her existing indemnification rights. In contrast, there is no prohibition on IHOP's discontinuing indemnification

---

[3] At my direction, the parties filed supplemental briefs on this issue and several others. The court thanks the parties for their valuable submissions.

once a person ceases to be a "Covered Person." Indeed, the indemnification clause essentially gives IHOP permission to do so by cabining the company's indemnification duties to current employees only.

Finally, some Delaware cases have recognized that a contingent right to indemnification may vest when an indemnifiable event occurs. *E.g.*, *Branin v. Stein Roe Investment Counsel, LLC*, 2015 WL 4710321, *3 (Del. Ch.) ("Branin's contingent right to indemnification vested on November 22, 2002, when [a lawsuit was filed against him]"); *Salaman v. Nat'l Media Corp.*, 1992 WL 808095, *6 (Del. Super.) ("Salaman's right to advancement and indemnification is a vested contract right which cannot be unilaterally terminated. Once an Indemnified Event occurred, the contract rights vested.").

But it is impossible to read these cases as announcing a free-standing right to vested indemnification for any and all current and former employees of a limited liability company. Rather, each case turns on its own facts and the relevant contractual language, and I must read them in light of the preeminent rule of freedom of contract.

The issue in *Branin*, for example, was whether the defendant LLC had to indemnify Branin for expenses he incurred when his former employer sued him. *Branin v. Stein Roe Investment Counsel, LLC*, 2014 WL 2961084, *1–2 (Del. Ch.). Defendant's LLC agreement clearly entitled Branin to such indemnification, but after the suit began defendant amended its operating agreement to relieve itself of its duty to indemnify Branin. *Id.* at *3. The Chancery Court held that Branin's right to indemnification under the original LLC agreement vested when his former employer sued him, and that the amendment could not unilaterally rescind that right. *Id.* at *8.

*Branin* simply did not address the issue that this case presents: whether a fired employee remains entitled to indemnification even after her firing, when she is no longer a "Covered Person."

Finally, to the extent any indemnification right might have "vested" in this case, it was a right to indemnification while Tangas was a "Covered Person" and involved, or threatened to be involved, in a proceeding. Nothing in Delaware law prohibited IHOP from so limiting its indemnification duties, and nothing in the LLC agreement requires IHOP to indemnify a former employee whom it had fired.

Accordingly, no reasonable jury could find that Tangas was entitled to indemnification under the IHOP LLC agreement.

### 3. Tangas's Fraud and Willful Misconduct Relieved IHOP of Any Duty to Indemnify Tangas

Even assuming, *arguendo*, that IHOP's operating agreement required it to indemnify Tangas, the undisputed evidence establishes that IHOP reasonably declined to do so because her conduct "with respect to" the criminal case amounted to "fraud, willful misconduct, bad faith or gross negligence." (Doc. 37–2 at 101).

### a. Business Judgment Rule

The parties' summary-judgment briefs proceeded on the assumption that the key issue was whether, on de novo review of the record, a rational jury could find that Tangas engaged in fraud or willful misconduct. That is, the parties appeared to assume the jury would owe no deference to the defendants' determination that Tangas's conduct disqualified her from receiving indemnification.

Questioning that assumption, I asked the parties to address whether "it would be appropriate for a rational finder of fact to defer in some way to defendants' finding that Tangas engaged in

fraudulent behavior[.]" (Doc. 52 at 4). By way of illustration, I noted that, in the employment-discrimination context, "[c]ourts may not second-guess the business judgment of an employer but must instead determine whether the employer gave an honest explanation of its behavior." (*Id.* at 3–4) (internal quotation marks omitted).

In their supplemental brief, defendants argue that Delaware's business judgment rule protects their decision not to indemnify Tangas. (Doc. 53 at 5, 9–12). Tangas contends that, because the LLC agreement clearly entitles her to indemnification, the business judgment rule cannot protect defendants from failing to do so. (Doc. 56 at 8–11).

"It is well settled under the Delaware business judgment rule that, in making a business decision, the directors of a corporation are presumed to act on an informed basis, in good faith, and in the honest belief that the action taken is in the best interest of the company." *Minnesota Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 797 (Del. Ch. 2006). To invoke this rule, which also applies to LLCs, an LLC's members or a corporation's directors "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Id.*

Having considered the parties' supplemental filings, I reject Tangas's contention that the business judgment rule is inapplicable.

As discussed, Tangas's entitlement to indemnification depends on whether: 1) the right to indemnification she enjoyed before her firing continued after IHOP fired her; and 2) her conduct amounted to fraud or willful misconduct.

Tangas is correct that the former issue is a pure legal issue that I must decide de novo: the contract either provides for post-termination indemnification or it does not. But the latter question

is not a pure question of contract interpretation; indeed, both sides agree that the contract forbids indemnification if Tangas engaged in fraud or willful misconduct with respect to the claims at issue in the criminal matter.

Because IHOP has the power to deny indemnification in those circumstances, Tangas is – contrary to statements in her brief – "ask[ing] this Court to second guess the propriety of an action that IHOP had the authority to take." (Doc. 56 at 9). Accordingly, Tangas must demonstrate that the evidence would permit a jury to find that IHOP's refusal to indemnify her was not the product of reasoned, well-informed decision-making.

### b. IHOP Reasonably Determined Tangas Engaged in Fraud

The undisputed evidence permits only one conclusion: IHOP made a reasonable decision to deny indemnification after investigating the situation and concluding that Tangas engaged in fraud.

First, there is no dispute that Ross gave Elkafrawi $50,000, that Tangas learned of this transaction shortly after the fact, and that she never reported it to IHOP. Likewise, IHOP's Code of Conduct encouraged employees to avoid conflicts of interest, and obligated them to report them when they arose.

Whether it was a loan or an investment, the payment to Elkafrawi created a conflict for Tangas. If it were an investment, then she had the proverbial "skin in the game" and would have lost her ability to report objectively on Elkafrawi's franchises. If the payment were merely a loan, and by virtue of Tangas's failure to report it, there was a risk that Elkafrawi could hold the transaction over Tangas's head, thereby imperiling her integrity as an FBC for IHOP.

Such an undisclosed conflict of interest will support a fraud finding under Delaware law, particularly where there is, as there was here, a duty to disclose. *In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 135, 143 (Bankr. D. Del. 2007).

Second, there is no dispute that, by the time defendants denied Tangas's request for indemnification, they possessed FBI reports documenting its investigation into Elkafrawi's and Tangas's alleged wrongdoing. (Doc. 37–2 at 4–5, ¶¶17–18). IHOP therefore knew not only that Tangas had failed to report a conflict of interest, but also that there was considerable evidence, at least in quantitative terms, that Tangas was part of Elkafrawi's conspiracy.

Third, although IHOP also knew that Tangas denied any criminal wrongdoing, defendants were not obligated to accept her assurances to that effect. There is simply no merit to Tangas's argument that IHOP lacked an adequate basis to conclude that her conduct amounted to fraud. (Doc. 46–1 at 11–14) (criticizing alleged unreliability of evidence that led to Tangas's indictment).

Finally, there is no reasonable dispute that Tangas's conduct occurred "with respect to" the criminal case. As the indictment itself establishes, the criminal case against Tangas depended on her alleged financial entanglement with Elkafrawi.

In the "Manner and Means" section of the indictment charging Tangas with conspiracy, and under the header "Collusion with the FBC," the grand jury charged that Elkafrawi enlisted Tangas "to minimize the likelihood that IHOP Corporate would question the weekly net sales figures underreported by" Elkafrawi's franchises. (Doc. 16–1 at ¶33).

More specifically, the indictment alleged that Ross's alleged loan was, in fact, "an undocumented investment" by Tangas into one of Elk's restaurants, and that Ross received health insurance and a paycheck in return. (*Id.* at ¶34). According to the indictment:

Prior to the December 18, 2003, purchase of the Findlay IHOP by Tarek Elkafrawi, Autumn Lee Tangas had informed Tarek Elkafrawi that IHOP Corporate needed to find a suitable purchaser for the Findlay IHOP. Autumn Lee Tangas knew that Tarek Elkafrawi did not have the financial ability to purchase the franchise at that time, but that she, herself, did. However, *Autumn Lee Tangas knew that, because of her position as FBC, she was precluded by IHOP Corporate from investing in any franchise*.

*    *    *

Autumn Lee Tangas failed to inform IHOP Corporate of her financial relationship with either [Ross] or Tarek Elkafrawi.

(*Id.* at ¶35) (emphasis supplied; some internal all-capitalizations omitted).

While Tangas's conflict of interest and her concealment of it were not elements of the charges against her, her resulting financial entanglement with Elkafrawi explained why Tangas would have participated in the conspiracy. Accordingly, no reasonable jury could find that IHOP failed to undertake an adequate investigation and make a reasoned decision that Tangas's fraudulent conduct "with respect to" the criminal case extinguished any right to indemnification.

### c. IHOP Reasonably Decided that Tangas's Refusal to Be Interviewed Was Willful Misconduct

Finally, a reasonable jury could only conclude that Tangas engaged in willful misconduct when she refused to participate in an internal IHOP interview.

Delaware case law establishes that an employee's knowing violation of an employee code of conduct amounts to willful misconduct. *See Avon Prods., Inc. v. Wilson*, 513 A.2d 1315, 1317 (Del. 1986) (defendant's violation of "company policy by leaving work early without authorization" "serve[d] to establish willful or wanton misconduct" and justified his firing).

Here, it is undisputed that IHOP's Code of Conduct required Tangas to cooperate with the company's investigation into the Elkafrawi case. (Doc. 37–2 at 30). It is also undisputed that IHOP's

investigation concerned the same subject matter as the criminal case: Elkafrawi's criminal activities at the IHOP restaurants that Tangas was partly responsible for overseeing.

Accordingly, there is no genuine dispute that defendants made a reasoned business judgment not to indemnify Tangas on the ground that her refusal to participate in the interview was willful misconduct "with respect to" the criminal case.

## Conclusion

It is, therefore,

ORDERED THAT:

1.  Defendants' motion for summary judgment (Doc. 37) be, and the same hereby is, granted; and

2.  Tangas's cross-motion for summary judgment (Doc. 46) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge